Good morning, judges. Monty Beck from Bozeman. This is my associate Sarah Baker from Bozeman as well. May it please the Court, Counsel for Bancinsure. I'm here today to ask the Court of Appeals to apply the language of insuring agreement E, entitled securities, and to not insert provisions that weren't written in that contract to cover a loan loss that the bank had where they extended credit when they relied on forged, altered, or counterfeit securities or corporate guarantees. Mr. Beck, I've practiced banking law for about 37 years, and I'm a little puzzled by your complaint here. The loan participation agreement contemplates issues of forgery, theft, and that nature, which is a very common arrangement, particularly when you have a securitized situation. But there was nothing in here about reviewing the credit. That's your responsibility. If you participate, if you borrow, if you get involved in the loan, it's your responsibility to check the credit. Even if every single one of these documents, wherever they are, had been forged, it would make absolutely no difference because these were bogus from the beginning. Where in the participation agreement can you point that indicates that the defendants in this case had any obligation whatsoever to undertake a credit investigation of this fraudulent scheme? Well, I'm really confused. Do you mean the defendant, the insurance company, to do an investigation? No, I'm sorry. What I'm talking about is the people under the loan participation agreement. You have the sellers, in this case, the sellers. There's no duty on their part expressly to check the credit involved to make any investigation whatsoever about the bona fides of the underlying loan. They're supposed to hold the documents, and they're supposed to insure against forgery. There's no problem with forgery here. You've not alleged anything about forgery. You're just saying, hey, we've lost a whole lot of money because this whole thing is a bogus deal, and we're looking for somebody to help us bear the loss, right? Isn't that what it really boils down to? No, Judge. It's totally different context. Okay. Tell me why it's different. Okay. The loan participation agreements, and if you've been a banker, you know that there's these… I'm a banker, a banking lawyer. Banking lawyer. Okay. Well, then you're aware that there's these multiple participant situations. Right. And so there's one lead bank that does its job, and it collects all the collateral and all the loan documents, and it says in a contract with each of those banks that they're responsible themselves for doing what we call due diligence. Okay? So in that sense… Did your client do that? Pardon? Did your client do that? Sure, they did. They did? And what did they find out about Mr. Perlman? It was an unbelievable scheme of fraud. Okay. Is that why they invested in it? But they didn't know about that at the time. I understand that. Neither did the seller, and it wasn't their responsibility to do so, was it? Well, it's equal responsibility on part of that. The seller sends these contracts… You would agree, would you not, that but for the contract, you have no relationship with them, right? The obligation is totally included in the contractual arrangements of the parties. Well, I don't necessarily agree that that would be the case. I think that that loan participation agreement sets forth the relationship between those two banks. But if this Bank of Bozeman, which was a startup bank, decided to and got all of these materials, which were completely fraudulent, Judge, and it was so sophisticated, auditor statements, financial statements, phony tax returns, on and on and on. You just couldn't even believe what they had here. I lament your loss. I really do. What obligation did the seller have under the terms of the documents to get behind the phony statements, the phony stock certificates, etc.? You mean what was the responsibility of the lead bank to do this? Correct. Oh, I have no quarrel with you that they had that obligation to do that. Why did they have that obligation? Well, they're the head bank of sorts, the lead bank that is the main bank that's approached. They don't have enough money or they don't have enough wherewithal to fund the whole loan, so they go out to all these multiple banks. We're in the document, does it say, that the lead bank represents and warrants to you that they're going to go out and do all these due diligence investigations and they're going to basically hold you harmless from any losses that occur as a result of these people being charged. Judge, I'm really having a puzzlement. This isn't about that. This isn't about whether or not the lead bank under those agreements were supposed to do all those things. This isn't about whether the small banks should have done all that stuff. Tell me what it is under the agreement that they did not do. Judge, I'm here on a wholly different contract and that's the analytical flaw that the district court went down. With all due respect, Judge, I really think that this whole thing with the lead or the lending participation agreements has caused the flaw in how we look at this insurance contract. Walk me through it. What contract, what breach? What I'd like you to just set aside. If you could just erase for a second here just what your initial thoughts are because of your background in banking. I'm not here to sue the lead banks. What I'd like you to do for a second is step back and look at the insurance contract. Okay. Okay, what the idea behind this insurance contract is this. There's these small banks. They pay a premium for fraud. One of the things that they get in exchange... What kind of fraud? Fraudulent. Forgery. Forgery, right? Forgery, counterfeit, or alteration of things like... And were any of these documents... Pardon? Is that the reason for the loss? Forgery, counterfeiting, or document alteration? Yes. That had nothing to do with it. Okay. They were fraudulent from the beginning. They were phony. There was nothing to back them up. There was nothing in the document, the insurance contract, that required them to investigate that, is there? Had the issue been that there had been a stock certificate signed by Joe Schmo instead of Mr. Perlman, then you might have a claim. But on the other hand, every single thing they put in was fraudulent. There were no claims. There was nothing. It was just all a big, phony deal. And I'm looking for you to show me in the insurance contract, or any other contract in this document, in this lawsuit, that says that they had an obligation to look to the bona fides of any of those things. And you have not... I don't know that there has been any allegation of forged documents, is there? Of course. What was forged? But, Judge, what you're trying to do here is you're looking at... I think you're focusing on this loan participation agreement issue. No, I'm looking at the insurance contract. Okay, so there's no obligation in the insurance contract that says to the banks that they are required to do this due diligence. Counsel, did you hear the question? I'm sorry. The question was what was forged. Oh, sure. I'd like to know the answer. Oh, you bet. Judge, there was the stock certificates that were forged. There were corporate guarantees that were forged. When you say forged... The secretary of the corporation for the stock certificates wasn't his signature on the stock certificates. As a matter of fact, there might even have been and could have been counterfeit stock certificates. Was that the reason they were worthless? No, no. Then let's assume for a moment that those were forgeries. If that's not the cause of the loss, why would there be any liability? Oh, because that's the factor. Those things induced the banks to get involved with this in the first place. And that's what you're trying to protect from. The certificates? Sure. Did you ever look at the certificates? I thought you didn't look at them. Sure, we did. We had those stock certificates. They already existed in the banks, in two of the banks. And before any bank ever lent any money, Judge, there were the stock certificates given to them. All these things were looked at. They thought they were real. They thought that they were real. They were stock certificates. And that's the whole purpose of having insurance for forgery fraud. That's the whole idea. And what I think, Judge, it's a very appealing argument, if I might just finish and then I'll get to you. It's a very appealing at first blush argument to say, oh, we can just wash this case away because this collateral was worthless to begin with. First of all, there's a real issue about whether that was the case. I mean, there was money in the bank. In 2004, 2005, and 2006, this corporation had money in the bank. Perlman, who's in jail, of course, he did say that there was assets in this corporation. There was $118 million is what he wrote in the affidavit. When I took his deposition, he just pled the fifth. But later on, he was required to cooperate with the government and everything. At any rate, there was an affidavit that Perlman has, and it's in your excerpts. I think it's 23, but he says this corporation did have significant value, $118 million. And it's true that there's we don't know when in time when the corporation did have money, but at the time that those small banks lent money, there was all the indices that that was the case. So at first blush, you might say, hey, it's worthless to begin with. But, Judge, in a bank's viewpoint, when they looked at all this stuff, they were induced in part because they honestly believed these stock certificates were real. They honestly believed that there weren't. Did they examine the certificates? Sure. Bank of Boston did? Yeah, and that's the point. I mean, at least there's factual issues created here. We had in the district court didn't look at this. If you read her orders, there isn't one mention of the pain and the effort that we had each of the bankers come forward, and they testified under oath that before we wrote the check to help fund this, that they had seen the collateralized documents. Now, the big issue was did they have original, and as you know, and now this will help on one of my arguments, is that, of course, the lead bank, the one who orchestrates the whole thing, collects the original, but each of the bankers in this case said we had copies. So there was this examination, and they each testified, and we even had them at the summary judgment hearing. I even made an offer of proof on some issues. But we had there the whole notion that these bankers said we were induced, based on these phony stock certificates and these phony guarantees, to do it. And had we had any inkling that these things were false or phony or anything, we would never have done it. And so it's a proximate cause analysis. I appreciate your argument, counsel, but I've got to say, if I set up ABC Corporation with my colleagues here, and we go to the dime store, and we get stock certificates, and we sign them, and we put them into an arrangement like this, and we say, you know, we're worth $400 million, but we'd like to have a loan in the meantime. The fact that we put that stock certificate in doesn't really mean much of anything. They're saying, hey, they got the stock certificate. But the obligation to check the bona fides of the loan is not theirs. It's yours. It's under the terms of any of these contracts you're talking about. And at the end of the day, you're really talking about that everybody got snickered. And I really feel bad for the bank. I mean, it's a tragedy for a lot of people that got snickered. But I still have not gotten an answer from you to my satisfaction that tells me where in any contract that's the subject of this litigation where lead banks assume the obligation to check the bona fides of the underlying parties. They have the documents. Yes, they did. But the loss did not stem from there being, in quotes, fraudulent stock certificates. It's that the stock certificates were on corporations that were worthless, didn't have what they purported to have, and you relied upon what they told you was underneath there. And, again, I'm sorry about that. This guy is a really bad crook. But that's not what they undertook to do, is it? But, again, I think you're confusing the seller. You're trying to say that I'm suing the lead bank or something. I'm not. This is an insurance contract. It's separate and apart. It doesn't have anything to say about whether the banks did or did not do a good job. Maybe you should sue the lead bank. Look at the contract. It's impossible to do that. That's why that contract's there. Because, see, it says each bank has that obligation to do due diligence and on and on. And, Judge, each bank had that. That agreement is just to require all banks to do that investigation that you're talking about. But with all due respect, I guess I did a poor job in the briefing. I must have done a poor job here arguing because you're on to the loan participation agreements. I wanted to talk about the insurance contract, and you're saying I'm already out. I can't get to the insurance contract, which is the whole purpose of why they did that. No, I asked you where in the insurance contract the obligation is undertaken. I don't think I heard from you. I'm sorry. I misunderstood you, and I think I thought... Under any of the contracts. Any contract. It's the subject of this litigation. Where did the folks that you've sued agree by contract to do what you say they didn't do? Judge, I didn't. I sued the insurance company. The insurance company isn't going to go do the due diligence that you're talking about. No, the insurance company just has these provisions that says if you relied in any sort of way on fraudulent, phony stuff, you get insurance coverage. Yeah, that's not what I said. Thank you. Okay, Judge. Thank you. We'll hear from Apelli. Good morning, Your Honors. May it please the Court. I'm Joe Nyland. I'm with the firm of Gregerson, Rosso, Johnson, Nyland, Minneapolis. I'm here representing the defendant, Apelli Bankinsure. One of the things that I heard opposing counsel say just a minute ago was that there is an argument that Pearlman's company, TCA, had assets. That's just not true. There is no argument about that. If you want to find it in the record, it's at ER 2.25, where in footnote number 7, Judge Osby specifically says that their argument was TCA had value because Pearlman said he had a bank account. It's true. Pearlman said he had a bank account. Their argument is they had assets because there was money in the bank accounts. It's true. There was money in the bank accounts. Those weren't assets of the company. Those were the stolen funds. And Judge Osby clearly says that stolen funds are not assets of the company. Can you walk me through? I mean, you sort of jumped in the middle, but let me just make sure I understand on which basis the insurance company denied the claim here. Do you dispute that there were forged documents? Yes. That's a fact issue, but Judge Osby never reached it. Well, but for purposes of summary judgment, we have to... Let's assume for purposes of summary judgment that there were forged documents. When I say you dispute it, do you dispute it for purposes of this appeal? No. Okay. So we have forged documents, right? Yes. And your client sold insurance against the risk of forged documents? Issued a financial institution bond, one of the elements of which was a forgery, yes. Okay. So the next step is they bring a claim saying we gave a loan, we relied on forged documents, we want to collect an insurance. And why, again, does the insurance company not pay up? I mean, I guess it could dispute forged documents, but assuming that there are forged documents, why don't you... Sure, I'll walk you through that. Insurance agreement E, which is the only surviving insurance agreement, says that there has to be a loss resulting directly from extension of credit on a certificated security and it was forged and these certificates were the originals were in the possession of the bank when the decision to extend the credit was made. So the very first thing is this condition precedent. Did they have possessions of the original... Yes, sorry, condition precedent. Did they have possession of the original stock certificates before they made the determination to extend credit? Well, the first thing they say is we never had them and I'm not sure why counsel is saying that the banks reviewed them because the banks never reviewed the originals. They never had possession of them, they never saw them, they never touched them. The argument they make is that they were part of a consortium of banks that made the loan and they relied on the examination of the originals by the lead bank and that the lead bank is their agent. That's what they're saying, Judge. It's exactly what they're saying. Why is that a perfectly good argument? Well, first of all, the lead banks never had the originals either. It was the lead bank's lawyer, this Durkin fellow, that had them. But for purpose of the argument, let's say that Durkin can be considered as part of the lead bank. Now the question that you raised and correctly point out is were the lead banks the agents of the participant plaintiffs here for purpose of possessing the collateral, the original collateral, before closing? What Judge Osby correctly did was she looked at the participation agreement. So it's not a question of fact. They have extrinsic evidence of that agency. What's wrong with their argument that agency is a question of fact under the applicable law? If there wasn't a participation agreement drafted the way it was, unambiguously said no. Speak into the mics. I'm sorry. If there was not a participation agreement in place that unambiguously defines the rights, duties, and obligations, I agree with you. Extrinsic evidence would be great. But here we've got loan participation agreements that are very specific. It may or may not cover the specific issue, though, in terms of are they agents for the purposes of retaining original documents for blanket bond purpose? I mean that is not addressed in the participation agreements. Why isn't extrinsic evidence, why doesn't it bear on that question? There's an integration clause in the participation agreements that's a very strong clause that says  we don't have any other duty. And when you're looking at the collateral, for instance, the collateral and the participation agreements are defined very precisely. And when the lead bank has an obligation to do something with the collateral, it says that. It does not make it ambiguous. I don't understand this at all. Look, banks don't have eyes and ears. Right? True. They have to use human beings to do stuff like that. True. Okay. And they can pick, it seems to me, any human being to be their agent for doing that because they don't have eyes and ears. They can't touch them. They can't smell the certificates. Why can't they say, look, we have an obligation to look at these things and the person we pick to be our agent for doing this, since we don't have eyes and ears and fingers, we can't touch these certificates, we pick the guy who's the lawyer for the lead bank. He was our agent. Now, that's not going to be in the policy because the decision of who our man on the street is who does this for us is just something between us and our agent. And we, as a matter of fact, are telling you, that guy was our agent. Now, what's wrong with that argument? Why is it not an issue of fact that you could disprove a trial but then entitled to come in and say he was our man who examined the originals for us? In the absence, Judge, of the participation agreement that defines what the duties and responsibilities are between the lead bank and the participant banks, I agree with you. Okay. Let's take the real world of loan participation agreements. If your argument is true, there never can be insurance for participating banks because there's only one original document. I mean, it's the way that these things work. This is not an atypical loan participation agreement. It's a very typical loan participation. And if we take what you say is true, tell me how the participating banks can possibly get insurance to cover this loan. Two ways. One, they could have sent a representative to the closing. Two, they could have put in the participation agreement, lead bank, you're my authorized representative for purposes of possessing the collateral before I extend the credit. You take that responsibility. Getting back to my point, this is not an atypical participation agreement. It's a normal participation agreement. I'm not quite sure what you mean by a normal participation agreement. I can tell you that in this agreement, they specifically did not take on that responsibility, and they specifically disavowed any other responsibilities that wasn't in the four corners of the unambiguous participation agreement. Okay. Well, let's move on then to what they actually did, which is they looked at the documents. If they'd flown out and they'd seen and touched with their hands the original documents, it wouldn't have made any difference, would it, in the real world? I don't know about that, and I'll tell you why. This is a separate basis that we believe would preclude summary judgment in favor of them were you to reverse and remand. And that's this good faith element. Now, your proposition is banker A goes out to the closing and looks at the documents, and now he's relying on them in some sense because he's actually looked at them. It wouldn't make any difference. I'm not sure that that's true because their authorized representative, Mr. Durkin, he was aware before these loans closed that this stock was not authorized by the articles. He knew that. He knew that this was bogus stock before they closed. Now, if what you're hypothesizing is that banker A acted the same way as the authorized representative and knew that this was bogus stock. Well, no, that's a different hypothetical. You're talking about what he knew before closing. I'm talking about what difference did it make from examining the documents because you're relying on not due diligence. You're relying on the fact they didn't have the originals. What difference does it make if they saw copies as opposed to going out and touching the original documents? Now, I grant you that's a factual issue. If you want to say in this particular case they would have known had they gone to closing, different issue. I'm just saying in the real world of loan participation agreements, what difference does it make? I would urge you to take a look, Judge, at the Bank of Marshall case because that case specifically talks about the importance of original versus copy. But that did not involve a loan participation agreement, though, did it? No, it was a financial institution case that had the forged copy and they relied on the forged copy. And the court there said that you can't rely on the forged copy. You have to have the original. And it goes into a discussion about why the original is important. I don't dispute that the original is important for somebody to look at. But the question here is agency and whether or not you require all of the loan participants. Your argument is that you don't insure it unless all of the loan participants go to closing and see the original document. Or? Yeah, I understand your alternative. That's your argument. Yeah, that's the argument. May I quickly in the time? I have to shift topics because you're out of time and I want to ask one more question. It seems to me that this comes down to the insurance to paragraph E. This is only a paragraph E argument. Now there is a case out of the Sixth Surrogate that says it doesn't make any difference if the collateral is worthless under subparagraph E. You're familiar with the case. I am. I've looked at all your cases and almost all of them are about subparagraph D. So tell me why we shouldn't follow the Sixth Surrogate and apply the law in the way they did. Sure. You're referring to the Manitowoc case. Exactly. And the difference is in the language, the standard that's in there. In Manitowoc, D, the insuring agreement D, where they found no coverage, had the exact same language, loss arising directly from language. And in there, there was worthless collateral. And because it had that standard, the court in Manitowoc said, you're out, you're not going to recover on D. Then it looked at the language in E. E is not the financial institution bond standard number 24. They changed it to make it a lighter standard, and I believe it said something like coming through or as a result of or something. But they lightened that proximate cause standard to something that was less, and they said, okay, this is a lower standard, E, and we are going to permit recovery here because you deviated. And I grant you the wording is different, but it is a different standard under E than D in this contract. There's an argument, I guess, and I think it's a pretty good one, that the worthless collateral doctrine doesn't apply and shouldn't apply to E. Because the idea here, if you'll just permit me, is that the credit was extended on the basis of the forged documents. The loss is the payment out. They never contemplated that they would resort to the collateral. I think there's flawed logic there. The loss is something different than the extension of credit. Let's assume the loss is the failure or the inability to recover on the collateral. That's the loss. The loss isn't loaning the money. The loss is the inability to get it back. Let's say, for example, they had perfectly good collateral. These documents were perfectly good. Why isn't there, if they suffer any loss at all with respect to a forged document, why can't they recover? If the collateral is good and the other terms are met, they would be able to recover. That's what the bond is for. But in this case, I think the district court went off on the concept that the loss here did not flow from forgery. It flowed from the lack of creditworthiness, which responsibility was expressly declined both by the insurance company and, frankly, the lead lender as well. But in this case, we're focusing on the insurance company. Is that a correct analysis? Yes, it is. But on the other hand, and I appreciate your comment that you're not an insurer of credit. We take that as a given. But nor can you, I think, on the other hand, rely on credit to deny liability on the insurance policy. Can you? I mean, the idea here is you may have liability. The question is one of damages, perhaps, not necessarily liability. But the insurance policy itself, counsel, does it not specifically say in E, covers losses resulting directly from the insured having in good faith extended credit on the faith of any original certificate and the like. So it is a condition precedent to recovery under the policy that the loss, if it's resulting from the creditworthiness, is not covered by this. The loss that's covered by the policy is if the loss results from the fact that these are forged documents. So, for example, say the collateral were United States savings bonds, and you had them there, and they look at them. It turned out they were completely bogus. They were forged by North Korea. And they really weren't U.S. government savings bonds. Then, of course, there would be clear recovery because they were looking. These are forged documents. They look to those. But in this case, E expressly eliminates liability for failure to properly have extended good faith and creditworthiness to the underlying obligors. Is that correct? That is correct. Okay. One last point, Judge. I know I'm out of time. I would urge you to take a look at the opinion that we submitted on a supplemental basis. That's this case. It's a trial judge in Minnesota has this case where the lead banks, along with the other participant banks. Is that the Marshall Bank case or a different one? Or Travelers' Indemnity? No, it's Alaris Financial National et al. versus St. Paul Mercury. It's a Hennepin County District Court decision. A lot of it is unrelated because it's an insuring agreement A case. But about half of it is exactly what you guys are going to grapple with. The same facts, the same bonds, the same issues. Undoubtedly, it will go up to their circuit court, too. I'm sorry? Undoubtedly, it will go up to their circuit court, too. It may or it may not because of other cases. But thank you, Your Honor. Okay, thank you. I think we're out of time. We can have a minute for rebuttal. If I could just throw in just a couple of comments. This whole idea of the worth, and this is the most important thing that's bothering you, Judge Smith, is this worthless collateral issue. In almost all of these cases in which you have insurance for this, there is no collateral. That's the whole point. They always end up being worthless. And the good cases that have analyzed that recognize that you have that, and that's what you theoretically bought insurance for. To your point, Judge Smith, on the contract, where it says that you're saying that there was no liability for this creditworthiness, I'm not here to argue about the creditworthiness. What that clause says is that you are going to be covered if you in good faith, which I had affidavits from each of the bankers saying that they did this, you know, truly believing that the guy had value to this, extended credit on the faith of these phony stock certificates. And that's all. Therein lies the rub. I know. Because it isn't the stock certificates that you were relying upon. It was the creditworthiness of Mr. Perlman, of which there was none. No, we didn't rely. Well, yes, you rely on the creditworthiness, but it was all phony stuff, and that's how these things happen. There's multitudes of cases in which phony titles to cars, phony deeds, phony stock certificates, like you mentioned. And that is the purpose of the insurance. If you look at it and read the cases that are under it, there's very good cases on my side. I know I'm dealing with a judge that's reluctant to do this, but if you would just read the cases, at least the ones I cited, forget those, you might come to a different conclusion. I've actually read your cases, but I will give it a fair look, okay? I hope you do, Judge, and I trust that you will. Lastly, it is on appeal, this Minnesota case, and it was mostly on A. The E analysis goes right to your thing about the worthless collateral. I just submit that. Thank you. The case is now submitted. We are adjourned. All rise.
judges: Kozinski, Thomas, Smith M.